IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION
FILED
FEB 1 9 2020
Clerk, U S District Court
District Of Montana
~~Billings~~

| UNITED STATES OF AMERICA, | CR 17-143-BLG-SPW-2 |
|---|---|
| Plaintiff, | |
| vs. | ORDER DENYING DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL |
| PETER MARGIOTTA, | |
| Defendant. | |

After a 5-day trial, a jury convicted the Defendant, Peter Margiotta, of violating the general duty clause of the Clean Air Act, knowing endangerment under the Clean Air Act, and conspiracy. (Doc. 121.) Margiotta moves the Court to set aside the verdict and either enter a judgment of acquittal or order a new trial for all three counts. (Docs. 146, 147, 148.) The Court recounted the background of this case in its earlier Order (Doc. 101), so it proceeds directly to the parties' arguments and incorporates evidence and testimony from Margiotta's trial as they become relevant. For the following reasons, the Court denies Margiotta's motions.

I.  **Legal Standard**

Pursuant to Fed. R. Crim. P. 29(c), a defendant may move for a judgment of acquittal within 14 days after a guilty verdict. To resolve such a motion, the Court determines whether, "after viewing the evidence in the light most favorable to the

1

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also United States v. Burns*, 701 F.2d 840, 842 (9th Cir. 1983) ("Credibility of witnesses and the weight accorded the evidence . . . are questions for the jury that are not reviewable.") Circumstantial evidence and reasonable inferences drawn from it can be sufficient to meet the elements of an offense and sustain a conviction. *United States v. Cordova Barajas*, 360 F.3d 1037 (9th Cir. 2004).

## II. Discussion

### 1. Sufficient evidence supports Margiotta's conviction for Count 2.

Margiotta initially raises a novel argument about 42 U.S.C. § 7413(c)(1) (the enforcement provision of the Clean Air Act): the Government needed to prove Margiotta knowingly violated a "requirement or prohibition" of § 7412 (addressing accidental releases of hazardous air pollutants), and the Clean Air Act's general duty clause, found under § 7412(r)(1), is not a "requirement or prohibition." Because the Government did not otherwise prove Margiotta knowingly violated a "requirement or prohibition" of § 7412, Margiotta contends, sufficient evidence does not support his conviction for Count 2.

Margiotta's argument about interpreting § 7413(c)(1) essentially amounts to an argument that Count 2 of the indictment fails to state an offense. Under Fed. R.

Crim. P. 12(b)(3), a party must raise a defense that the indictment fails to state an offense before trial "if the basis for the motion is reasonably available and the motion can be determined without a trial on the merits." Margiotta did, in fact, move to dismiss Count 2 for failure to state an offense. (Doc. 90.) This new argument, like those Margiotta raised in his motion to dismiss Count 2, was capable of determination before trial and should have been raised at that time. Moreover, in its order denying Margiotta's earlier motion to dismiss Count 2, the Court determined "the plain language of § 7413(c) clearly provides criminal penalties for knowing violations of § 7412, which includes the [Clean Air Act]'s general duty clause." (Doc. 101 at 7.) The Court declines to consider Margiotta's new argument now.[1] Accordingly, the Court determines only whether there was sufficient evidence to meet each element of Count 2.

There was. The Court gave the following jury instruction outlining the elements for Count 2, Clean Air Act-General Duty Clause, to which both parties agreed:

---

[1] Nevertheless, had Margiotta properly raised this argument before, the Court would be inclined to agree with the Government's analysis. *See* (Doc. 172 at 9 n. 4.) Section 7413(c)(1) states the penalties for several different knowing violations of the Clean Air Act. Section 7413(c)(1) lists each violation as a distinct and disjunctive clause. While some contain language about violating a "requirement or prohibition," others do not. The clause referring to § 7412 (which includes the general duty clause) does not. Therefore, accurately read, the statute states, "Any person who knowingly violates . . . section 7412 of this title . . . shall, upon conviction, be punished . . . ." Section 7413(c)(1).

3

> First, the Defendant was a person;
> Second, the Defendant was the owner or operator of a stationary source;
> Third, the stationary source produced, processed, handled or stored an extremely hazardous substance;
> Fourth, the stationary source posed a hazard of accidental release of such substance into the ambient air;
> Fifth, the defendant failed to: (1) to identify hazards that may result from such releases using appropriate hazard assessment techniques, (2) to design and maintain a safe facility taking such steps as are necessary to prevent releases, and (3) to minimize the consequences of accidental releases which do occur;
> Sixth, the hazard was recognized by the Defendant, or generally within the Defendant's industry; and
> Seventh, the Defendant acted knowingly.

(Doc. 127 at 44–45 (Inst. No. 37).) This jury instruction was based on 42 U.S.C. §§ 7413(c)(1), 7412(r)(1), and 29 U.S.C. § 654 (the general duty clause from the Occupational Safety and Health Act, which 42 U.S.C. § 7412(r)(1) refers to).

The Government presented the jury with sufficient evidence to meet each element. First, it showed that Margiotta was a person, and second, that he was the owner or operator of the Custom Carbon Processing (CCP) stationary source. (Doc. 157, Tr. at 520–22.) Third, the Government proved that the CCP facility "produced, processed, handled or stored" natural gas condensate—an extremely hazardous substance. (Doc. 158, Tr. at 767–69; Doc. 129-1, Gov. Ex. 19.) Fourth, the Government's expert, Jeremy Deyoe, opined that the facility posed a hazard of accidental release of the natural gas condensate into the ambient air,

4

largely due to the facility's design: the open sump, the open shaker, and the open pole barn with garage doors and fans venting gases within the facility directly into the exterior air. (Doc. 158, Tr. at 767–69.)

Fifth, the Government provided sufficient evidence to show Margiotta failed "to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur." 42 U.S.C. § 7412(r)(1). Mark Hurst, the project manager for the CCP facility, testified that the facility originally began as an injection well but transformed into an indoor slop oil processing center. (Doc. 157, Tr. at 520.) CCP rented several outdoor tanks to store the viscous, tar-like slop oil. (*Id.* at 541–42.) After the rental company demanded the tanks' return, Margiotta required a solution for cleaning the tanks out to return them in an acceptable condition. (*Id.* at 542.) Hurst proposed a specialized cleaning company, but Margiotta rejected the option as too costly. (*Id.*) Instead, Margiotta decided to begin using natural gas condensate, a highly flammable and dangerous substance, to thin out the slop oil to remove it from the tanks. (*Id.* at 543.)

Hurst strongly advised against this because the CCP facility was not equipped to handle natural gas condensate—it lacked explosion-proof wiring and proper

ventilation. (*Id.* at 534–37, 543.) Charlie Bredthauer, who designed much of the facility, testified he never designed it to process natural gas condensate. (Doc. 155, Tr. at 265.) Moreover, the facility lacked insulation. On cold days, Hurst testified that sometimes, the employees shut the garage doors to stay warm, even if it meant filling the facility with fumes. (Doc. 157, Tr. at 547–50.) On one occasion, Hurst visited the facility in November 2012 without notifying the foreman ahead of time. (*Id.* at 547.) He testified he was shocked to find the garage doors closed and vapors so thick he could hardly see through them. (*Id.* at 548.) He took a picture and emailed Margiotta about the dangerous conditions, numerous deficiencies, and the lack of oversight. (*Id.* at 548–50; Doc. 129-1, Gov. Exs. 19, 65, 66.) By December 29, 2012, the day of the explosion, the conditions had not improved. (Doc. 157, Tr. at 550.)

Sixth, Margiotta recognized the hazard the facility posed. In an email, Hurst warned him about some of the conditions: "Control panels must be moved ASAP with the explosion-proof wiring. We also run the risk of killing someone, not only one of our operators but also our customers." (Doc. 129-1, Gov. Ex. 64.) This was in addition to the emails Hurst sent Margiotta about the facility's deficiencies, including its lack of explosion-proof wiring and adequate ventilation. (*Id.*, Gov. Exs. 19, 65, 66.) Margiotta knew the facility lacked sufficient ventilation. (Doc.

155, Tr. at 194–95, 264–65.) And although Margiotta recognized there was a safer (albeit more expensive) option for cleaning out the outdoor rental tanks, he chose to have the facility accept the natural gas condensate, despite Hurst's warning that the facility was unequipped to handle the substance. (*Id.* at 542–43.)

Finally, Margiotta acted knowingly. Ample testimony established him as the CEO and final decision-maker for CCP. (*Id.* at 520–22; Doc. 155, Tr. at 163–64.) He knew the facility was operating and knew the risks posed by its continued operation. *E.g.* (Doc. 157, Tr. at 548–50; Doc. 129-1, Gov. Exs. 19, 65, 66). He was the one who directed Josh Garrison, one of the facility's supervisors, to accept a shipment of natural gas condensate on December 29, 2012. (Doc. 157, Tr. at 493–94.) Sufficient evidence supports each of the seven elements; a judgment of acquittal is denied as to Count 2.

*2. Sufficient evidence supports Margiotta's conviction for Count 3.*

The Court gave the jury the following instruction outlining the elements of Count 3, Clean Air Act-Knowing Endangerment, to which the parties agreed:

> First, the defendant is a person;
> Second, the defendant knowing[ly] released or caused to be released into the ambient air a hazardous air pollutant or extremely hazardous substance; and
> Third, the defendant knew at the time he thereby placed another person in imminent danger of death or serious bodily injury.
> The term "person" includes an individual or corporation.

7

> You are instructed that benzene, ethylbenzene, hexane, toluene, xylene isomers, m-xylene and o-xylene are hazardous air pollutants as a matter of law.

(Doc. 127 at 59 (Inst. No. 49).) The three elements are derived from 42 U.S.C. § 7413(c)(5)(A), while the hazardous pollutants are listed in § 7412(b). Furthermore, the Court instructed the jury on the two different definitions of knowledge between the second and third elements. Specifically, as to the second element, the Court instructed that "An act is done knowingly if the defendant under your consideration is aware of the act and does not act through ignorance, mistake, or accident." (Doc. 127 at 60 (Inst. No. 50).) As to the third, the Court instructed that "In determining whether the defendant knew that a release placed another person in imminent danger of death or serious bodily injury, the defendant is responsible only for actual awareness or actual belief that he possessed." (*Id.* at 63 (Inst. No. 52).)

First, the Government showed Margiotta is a person. (Doc. 157, Tr. at 520–22.) Second, the Government showed Margiotta was aware that he was causing the release of a hazardous air pollutant or extremely hazardous substance. As the Court discussed earlier, Margiotta decided to begin accepting shipments of natural gas condensate. (*Id.* at 543.) Margiotta was also aware that the garage doors at the facility vented the various air pollutants and substances that the facility processed

8

into the outside air. (*Id.* at 536, 543, 548–550.) On December 29, 2012, according to Josh Garrison, Margiotta directed Garrison to accept shipment of condensate and "to find somewhere to put it." (*Id.* at 433–34); *see also* (*Id.* at 493) (Garrison testified he did not want to accept the load, but Margiotta gave him no choice). Garrison further testified that CCP's policy was to unload any substances delivered to the facility through the open shaker. (*Id.* at 425.) Margiotta was aware that this process, along with the facility's design, released substances unloaded into the shaker into the ambient air. (*Id.* at 548–50; Doc. 158, Tr. at 767–69.) Therefore, one could infer that Margiotta was aware the natural gas condensate would be released into the ambient air when he told Garrison to accept the shipment on December 29, 2012.

Notably, Hurst testified that nobody would have told Garrison to put the condensate through the shaker, including Margiotta. (Doc. 157, Tr. at 576.) However, where Hurst's and Garrison's testimonies conflicted, it was the province of the jury to determine who was more credible—not the Court's. *See United States v. Burns*, 701 F.2d 840, 842 (9th Cir. 1983). The jury could have believed Margiotta directed Garrison to accept the shipment, and because CCP had a policy of running every shipment of a substance through the shaker, Garrison had no choice but to put the condensate through the shaker. Sufficient evidence supports

Margiotta's knowledge that he was causing a hazardous air pollutant or extremely hazardous substance to be released into the ambient air.

Third, the Government showed Hurst had actual knowledge that by releasing the condensate, he placed another person in imminent danger of death or serious bodily injury. Margiotta knew the facility lacked adequate ventilation and lacked explosion-proof wiring. (Doc. 157, Tr. at 534–37, 543.) He knew the inadequate insulation caused his employees to shut the garage doors to stay warm, further preventing fumes inside the facility from venting into the outside air. (Doc. 157, Tr. at 547–50.) He knew there had been complaints about employees smoking inside the facility. (*Id.* at 543.) He knew no written policies existed addressing workplace safety or for operating the facility and handling the substances processed there. (*Id.* at 492.) And with actual knowledge of all these issues, he directed Garrison to accept a shipment of condensate on December 29, 2012—a substance Margiotta knew to be highly volatile and dangerous—despite Garrison's protests. (*Id.* at 433–34.) Sufficient evidence supports Margiotta's conviction for Count 3.

Margiotta focuses on the "*cause* of the explosion," which he contends was Josh Garrison placing the condensate in the shaker and the fumes contacting an open flame on a propane heater in the break room. (Doc. 164 at 6) (emphasis in original). Indeed, Margiotta may not have had actual knowledge that there was an open-flame

heater in the break room (there was not testimony or evidence establishing he did). However, Garrison testified CCP's policy was to run any substance stored in the inside storage tanks through the shaker. (Doc. 157, Tr. at 425.) Garrison further testified he told Margiotta and Hurst he did not have room for the shipment of condensate on December 29, 2012, at the CCP facility. (*Id.* at 433–35.) However, Margiotta and Hurst told him he "didn't have a choice" and "to find somewhere to put it." (*Id.* at 434.) Once the shipment arrived, Garrison testified his only option was to pump the condensate through the shaker and store it in an indoor tank. (*Id.* at 438–39, 480–83.)

Although, as the Court noted earlier, portions of Garrison's testimony conflict with Hurst's, it is the province of the jury to determine whose testimony is more credible. Margiotta argues other options existed for Garrison when the condensate shipment arrived. (Doc. 164 at 5–6); *see* (Doc. 157, Tr. at 480–85) (Garrison explains why he ran the condensate through the shaker on cross examination). However, a rational trier of fact could have found, based on Garrison's testimony, that Margiotta was aware his own actions would cause a release of the condensate. Moreover, a rational trier of fact could have found that based on the numerous deficiencies at the facility Margiotta had actual knowledge of, he knew that by releasing the condensate into the ambient air, he was placing others in imminent

11

danger of death or serious bodily injury. That the explosion did, in fact, cause serious bodily injury establishes the imminent danger (the jury heard evidence about both Garrison's injuries, (Doc. 129-1, Gov. Ex. 33), and Alan Osborne's, who was another employee (Doc. 155, Tr. at 300–01)).

And even if Margiotta was not actually aware of the propane heater in the break room, the statute asks only whether he had actual knowledge that his actions placed another in imminent danger of death or serious bodily injury. 42 U.S.C. § 7413(c)(5). Death or serious bodily injury does not necessarily need to occur for a defendant's actions to meet the elements of the statute, nor does the statute require the defendant to have actual knowledge of the cause when death or serious bodily injury does occur. Margiotta was actually aware of several deficiencies at the facility that posed the risk of death or serious bodily injury upon the release of the condensate—the "*cause* of the explosion" notwithstanding. Judgment of acquittal is denied as to Count 3.

3. *Sufficient evidence supports Margiotta's conviction for Count 1.*

The Court gave the following instruction for the elements of the conspiracy charged in Count 1:

> First, beginning in approximately July, 2012, and continuing until approximately December 29, 2012, there was an agreement between two or more persons to commit at least one crime as charged in the indictment, either Count 2 or Count 3 of the Indictment; and

   Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and
   Third, one of the members of the conspiracy performed at least one overt act on or after December 22, 2012 for the purpose of carrying out the conspiracy.

(Doc. 127 at 34 (Inst. No. 30).) The Court also instructed the jury on various aspects of what constitutes a conspiracy, overt acts, multiple conspiracies, and knowledge of and association with other conspirators. (Doc. 127 at 36–41 (Inst. Nos. 31–34).)

During trial, the Government elicited testimony from multiple individuals involved with Margiotta in the construction, design, and operation of the CCP facility, including Bredthauer and Hurst. (Doc. 155, Tr. at 168–73; Doc. 157, Tr. at 524, 526–27, 530, 532–33, 537.) Bredthauer, Hurst, and Margiotta all knew that operation of the facility caused the release of vapors into the air. (Doc. 157, Tr. at 536, 543, 548–550.) Margiotta made the decision to use the condensate to clean the outside storage tanks while knowing of the deficiencies in the facility's design making it dangerous to process the condensate there. (*Id.* at 543–44.)

The fact that Hurst pleaded guilty to negligent endangerment under the Clean Air Act is unavailing to Margiotta's position: evidence established multiple members of the conspiracy, and Margiotta—not Hurst—controlled whether the facility remained open and directed Garrison to accept the condensate shipment on

December 29, 2012. Margiotta also argues that Garrison acted on his own accord when running the condensate through the shaker to store it inside. (Doc. 166 at 5–7.) But once again, resolving credibility issues between witnesses is the province of the jury. As the Court has already determined above, sufficient evidence supports Margiotta's convictions for Count 2 and Count 3. A rational trier of fact could have found that there was an agreement between Margiotta and one or more other individuals to commit at least one of these other two counts, Margiotta became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it, and Margiotta performed at least one overt act for the purpose of carrying out the conspiracy. Judgment of acquittal is denied as to Count 1.

4. *Margiotta is not entitled to a new trial under Fed. R. Crim. P. 33.*

Fed. R. Crim. P. 33 governs motions for new trials and authorizes the Court, upon the defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." The Court's discretion when granting a motion for a new trial is much broader than when granting a motion for judgment of acquittal. *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1211 (9th Cir. 1992).

> The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the

verdict, grant a new trial, and submit the issues for determination by another jury. This authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice.

*United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980).

As the Government points out, (Doc. 172 at 14–16), Margiotta does not make an argument that he is entitled to a new trial in any of the briefs in support of his motions. *See* (Docs. 164–66). It is unclear whether he seeks a new trial under Rule 33 or Rule 29(d). Rule 29(d) states, "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination."

Regardless, the Court will treat Margiotta's motion as having been made under Rule 33. However, even given the Court's wider discretion when considering the motion, "the interest of justice" does not require a new trial. *See* Fed. R. Crim. P. 33. Although Hurst testified Garrison would not have needed to run the condensate through the shaker, there was no written policy or procedure for storing and processing the variety of substances delivered to the CCP facility, and Garrison was under the sincere belief that he had been instructed to run every substance stored inside through the shaker. In certain ways, the testimony conflicted, but the Court concludes the evidence does not "preponderate[]

15

sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred . . . ." *See Lincoln*, 630 F.2d at 1319.

### III. Conclusion

Sufficient evidence supports Margiotta's convictions in all three counts. Moreover, despite some apparently conflicting testimony, a new trial is not warranted under Fed. R. Crim. P. 33. Accordingly,

**IT IS HEREBY ORDERED**:

1. Margiotta's Motion to Set Aside the Verdict and Enter Judgment of Acquittal on Count 1, or for New Trial (Doc. 146) is **DENIED**.

2. Margiotta's Motion to Set Aside the Verdict and Enter Judgment of Acquittal on Count 2, or for New Trial (Doc. 147) is **DENIED**.

3. Margiotta's Motion to Set Aside the Verdict and Enter Judgment of Acquittal on Count 3, or for New Trial (Doc. 148) is **DENIED**.

The Clerk of Court is directed to notify counsel of this Order.

DATED this 19th day of February, 2020.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge