Palmer A. Hoovestal, Esq.
Hoovestal Law Firm, PLLC
608 Lincoln Rd. West
Helena, MT 59602
P.O. Box 747
Helena, MT 59624-0747
Tel. (406) 457-0970
Fax (406) 457-0475
Email: palmer@hoovestal-law.com
Attorney for Defendant
PETER MARGIOTTA

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| UNITED STATES OF AMERICA, | Cause No. CR 17-143-BLG-SPW |
|---|---|
| Plaintiff, | |
| v. | **SENTENCING MEMORANDUM** |
| PETER MARGIOTTA, | |
| Defendant. | |

Peter Margiotta lost everything in the blink of an eye. After the exertion of incredible effort, years of planning, sacrifice, labor and investment, all that he had worked for was completely destroyed in mere seconds. He could barely believe his ears when Mark Hurst told him over the phone that the plant had exploded and was burning to the ground. Peter sat

in disbelief, stunned, barely able to comprehend the bad news. He was ruined and he knew it.

It took him awhile to recover from the shock of the news, but when he did, he began making calls. He called the fire chiefs in Baker and Wibaux. He called local law enforcement. He called Woody's Trucking, Charley Bredthauer and Mark Hurst. He checked on the welfare of his employees and gathered people who could assist with the situation, including Mark Hurst and Michel St. Pierre, and they got in their cars and began driving from Edmonton to Montana.

When it seemed that things could not get any worse, Peter's father died. Peter turned around and returned to Edmonton so he could deal with the passing of his father while the others continued on. The fire, meanwhile, did not stop burning. Days passed. When he finally arrived, Peter found the charred ruin of black, twisted metal that had been the Custom Carbon Processing Plant. It was a total loss.

Natural gas condensate is used like a solvent in the oil and gas industry to thin crude oil so that the crude can be processed with a centrifuge into a sellable product. Everybody knows that natural gas condensate can vapor and that the vapors are flammable. That was not a secret to anybody. That's why they stored it in the storage tanks outside the plant. A driver hauling

2

condensate could back his truck to any one of the storage tanks, hook a hose to a valve on the tank, and use the truck's pumps to offload the condensate directly into the tanks.  In fact, the driver from Woody's Trucking, Kelly Steen, had done exactly that on six or seven prior occasions.  The normal procedure when delivering condensate was to offload it in the outside tanks. Steen would pull up and tell whoever was running the place at the time that he had so many barrels, and then ask which tank they wanted it in.  There were multiple 400-barrel tanks outside.  They'd tell him to put it in whichever tank was the lowest.  He would then hook up his hoses, open the valve and pump it off into that tank.  He had an 80 barrel tank on his truck and was also pulling a pup trailer with an 80 barrel tank on it.  The hoses on his truck were three-inch rubber hoses with brass fittings.  He would pull it off and plug it into his pump, plug it into their tank, open the valve on their tank and open his valve. Then he would open the two hoses between his truck tank and his trailer tank, open up the vent on the back of the trailer, so when he started discharging, it emptied the back tank first, and then emptied the main tank. That was the procedure that he had employed to offload the condensate into the outside tanks six or seven times before.  He had 40 barrels in the front and 70 in the back, for a total of 110 barrels.  That would have easily fit in one of the 400-barrel tanks on the outside. Steen knew Josh

Garrison and had previously dealt with Garrison about ten times. That was the normal offload procedure that he employed every time – except for the time of the fire.

They did not follow that procedure when the fire happened. Instead, Josh Garrison told Steen to put the condensate into the shaker. They took the hoses on Steen's truck and just threw them over the edge of the top of the shaker. That was very strange and abnormal for Steen, but that's how Josh wanted to do it. Condensate started flowing out when he turned his pump on. It was sloshing all over the place and there were lots of fumes. Steen put a piece of cardboard on top to prevent the sloshing, but that didn't help. They probably unloaded three or four barrels when the fire started.

Nobody knows why Garrison flopped the hose over the side of the shaker when the normal procedure was to offload it into the tanks outside. Nobody knows why Garrison just didn't attach one of the truck's hoses to one of the inside tanks to offload the condensate. Mark Hurst never told Josh Garrison to dump or empty condensate into the shaker. In fact, nobody ever told Josh Garrison to empty condensate into the shaker. Hurst was in charge of reviewing the shipment loads, and so he knew what and how much material was in the outside tanks. There were outside tanks that were empty or had very little material in them that could have been utilized to put that

4

condensate in on December 29, 2012, and it was entirely possible for Josh Garrison to tell the truck driver to back up to one of those outside tanks and to use his hose on the truck to offload that stuff into one of those outside tanks. The second alternative was to back up the truck to the bay door and use the hose from the truck and offload it directly into one of the inside tanks. That way he could have avoided any vapors or fumes wafting out of the shaker into the open area and then into the break room. Hurst specifically told Garrison to use other hoses, the hoses from the truck, if the lines were frozen. Nobody ever told Josh Garrison to empty condensate into the shaker. That was a ludicrous idea.

    Nevertheless, that is what he did. When Anthony Maxwell got up and opened the door to the breakroom so he could clean up and start his 4:00 o'clock shift as a dishwasher and cook at the Shamrock Bar and Restaurant in Wibaux, the fumes and vapors from the condensate sloshing around in the shaker wafted into the breakroom. They came into contact with the open flame from the propane heater that Daniel Hollan was warming himself with while he played Angry Birds on his cell phone. Suddenly Hollan noticed a big spark at the open flame heater, and then a flame going toward the door between the break room and the main part of the building.

    The wiring and the electrical work did not cause the fire. The fans

5

didn't cause the fire.  The lack of permits, electrical, building, mechanical, or plumbing, if any were even required, did not cause the fire.  The worn out centrifuge didn't cause the fire.  The decision to accept the condensate didn't cause the fire.  The fire occurred because Josh Garrison flopped the hose over the edge of the shaker, turned on the shaker, and started sloshing condensate all over the place, producing flammable vapors that wafted to the break room and caught fire.  Josh Garrison's deviation from the normal offloading procedure was the undeniable cause of the fire.

     Jerry Smith, a deputy state fire marshal, determined that the fire was accidental and that nobody purposely went in and caused it.  Charley Bredthauer designed the place, Mark Hurst ran it, and Josh Garrison operated it.  Peter Margiotta did not design it.  He did not run it.  And he did not operate it.  Peter Margiotta was not even present when the fire occurred and had no idea that Josh Garrison decided to flop the hose over the side of the shaker instead of offloading it the way they had done it six or seven times before.  The fire was an accident.  If Peter Margiotta had known what Josh Garrison was doing, he would have done everything he could to prevent it.  He wasn't there, however, and he didn't know.

     The criminal code punishes conduct that people know is unlawful. Everybody knows that the distribution of methamphetamine is against the

law, yet people sell methamphetamine all the time. The same goes for violent crimes like robbery, yet courts deal with robberies every day. Non-violent crimes like lying to Congress also happen deliberately and intentionally. It is knowing and purposeful violations of the law that deserve to be punished.

 Accidental conduct, however, does not merit punishment. Punishment does not deter accidents from happening. Punishing accidental conduct does not promote respect for the law. It is difficult to protect the public from accidents because by their very nature, nobody knows when or how they will happen. That is why they are called accidents. The fire caused civil litigation that resulted in the damaged parties being compensated for their injuries.

 The Indictment in this case was filed on December 21, 2017 – eight days before the running of the statute of limitations – and most likely as a test case for the General Duty Clause of the Clean Air Act. As these words are being written, a hearing is being held before the House Judiciary Committee on Justice Department decisions under Attorney General William Barr. Among those include decisions made by the Justice Department during the prosecution of Roger Stone. Earlier this year, after Roger Stone was convicted of obstructing justice, Attorney General Barr overruled prosecutors and recommended a lighter sentence for Stone, a personal friend of President Trump. All four prosecutors involved in the case immediately withdrew, yet

stone received a more lenient sentence.  The sentencing memoranda in that case are attached.  See Government's Sentencing Memorandum and Supplemental and Amended Sentencing Memorandum, *United States v. Stone*, No. 19-cr-00018 (D.D.C., Feb. 11, 2020) hereto attached and incorporated by this reference as Defendant's Exhibits A and B.  Comparing the two memoranda, it is clear that the Department of Justice now concedes that if following the guidelines would cause a non-violent felon's sentence to disproportionately escalate to something more apt for a violent felon, a court should take that into account.  The Department of Justice also asked the court to consider Stone's "advanced age, health, personal circumstances, and lack of criminal history" when determining his sentence.  Prosecutors emphasized that the recommended sentence under the guidelines is more typical for defendants with more substantial criminal history or who obstructed justice as part of a violent criminal organization.  According to the Justice Department's stance in Stone, it is now appropriate for courts to consider age, health, personal circumstances or lack of prior criminal history in deciding whether the guidelines would give a defendant too much time.

Even though Peter Margiotta is not a friend of President Trump, the Justice Department's stance in Stone makes it fair game for the Court to now consider the combination of age, non-violence, lack of a prior criminal history,

8

and personal circumstance to be sufficient reasons to depart from the guidelines in Margiotta's case. The Department of Justice's position now is if the guidelines would push Margiotta's sentence into the realm normally reserved for violent offenders, which it does, the fact that his age and the harm caused to him by the fire, including that he lost everything, even his father, when he wasn't there and had no involvement in Garrison's decision to flop the hose over the shaker, much less even know that Garrison was doing it at the time, and that other people who did more than he did then got less time than the guidelines recommend, is appropriate for a lesser sentence.

Under these facts and circumstances Peter Margiotta should not spend a minute in jail. A sentence that is sufficient, but not greater than necessary, is a sentence of probation. He should be placed on probation and ordered to return to Canada where he can serve the terms of his sentence.

DATED this 24th day of June, 2020.

RESPECTFULLY SUBMITTED:


By: s/ Palmer Hoovestal
    Palmer A. Hoovestal, Esq.
    Attorney for Defendant
    PETER MARGIOTTA

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2020, a copy of the foregoing document was served on the following persons by the following means:

<u>1, 2</u>   CM-ECF

<u>    </u>   Hand Delivery

<u>    </u>   Mail

<u>    </u>   Overnight Delivery Service

<u>    </u>   Fax

<u> 3 </u>   E-Mail

1. CLERK, UNITED STATES DISTRICT COURT

2. BRYAN DAKE
   Assistant United States Attorney
   Counsel for the United States of America

3. PETER MARGIOTTA
   Defendant

                                                By: /s/ Palmer A. Hoovestal
                                                          Palmer A. Hoovestal
                                                          Attorney for Defendant